Andrew M. Calamari
**REGIONAL DIRECTOR**
Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
Phone: (212) 336-1023 (Brown)
Email: brownn@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION** | : | |
| | : | |
| Plaintiff, | : | 15 Civ. _____ ( ) |
| | : | |
| v. | : | **ECF Case** |
| | : | |
| **JASON W. GALANIS, JOHN P. GALANIS,** | : | |
| **JARED M. GALANIS, DEREK M. GALANIS,** | : | **COMPLAINT** |
| **GARY T. HIRST, and GAVIN L. HAMELS,** | : | **AND JURY DEMAND** |
| | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Jason W. Galanis ("Jason Galanis"), John P. Galanis ("John Galanis"), Jared M.

Galanis ("Jared Galanis"), Derek M. Galanis ("Derek Galanis"), Gary T. Hirst ("Hirst") and

Gavin L. Hamels ("Hamels") (together, the "Defendants"), allege as follows:

### SUMMARY OF THE ALLEGATIONS

1.      This case involves a fraudulent scheme orchestrated by Jason Galanis to secretly

dump millions of shares of Gerova Financial Group, Ltd. ("Gerova" or the "Company")—a

foreign private issuer with securities listed on the American Stock Exchange ("NYSE Amex")

and the New York Stock Exchange ("NYSE")—in an unregistered offering and distribution.  To

carry it out, Jason Galanis enlisted his father (John Galanis), his two brothers (Jared Galanis and

Derek Galanis), a family friend from The Republic of Kosovo ("FF-1"), and a Gerova officer and director (Hirst). Eventually, Gerova's share price tumbled in reaction to the massive sell-off engineered by Jason Galanis. To stem the price decline, Jason Galanis orchestrated a second phase of the scheme to artificially stabilize Gerova's stock price: he bribed two investment advisers to buy Gerova shares in their respective clients' accounts, in order to create demand for the stock. All told, Jason Galanis's scheme reaped him and his family members over $16 million, all at the expense of unwitting investors.

2.      Jason Galanis hatched his scheme in early 2010. With the knowing assistance of Hirst, the president and chairman of Gerova, Jason Galanis defrauded Gerova into issuing 11,000,000 warrants to FF-1, who was recruited to participate in the scheme by Derek Galanis. The 11,000,000 warrants were issued to FF-1 under the fraudulent pretext of a consulting agreement. In fact, FF-1 had no connection to Gerova and never performed any services for the company. At Jason Galanis's direction, FF-1 exercised the warrants under a cashless exercise provision, and, with the substantial and knowing assistance of Hirst (but without notice to or approval of Gerova's board of directors), received 5,333,333 unrestricted shares of Gerova, worth more than $72,000,000 on the open market at the time they were issued. Once issued, the 5,333,333 shares constituted roughly half the Company's public float.

3.      Once the Gerova shares were in FF-1's name, John Galanis, Derek Galanis and Jared Galanis—all acting at Jason Galanis's direction and with knowledge of the scheme— helped FF-1 deposit the Gerova shares in three separate U.S. brokerage accounts, and either directed FF-1 when and how to sell them, or, in the case of Jared Galanis, directly placed orders to sell the shares into the public U.S. markets, realizing approximately $20 million. At the direction of Jason Galanis, John Galanis, Derek Galanis, and Jared Galanis, the proceeds were

wired to or for the benefit of Jason Galanis, his family members (including John, Derek and Jared), Hirst, and other individuals and entities affiliated with Jason Galanis.

4.      In the second part of the scheme, as FF-1 was dumping the Gerova shares in the market, Jason Galanis bribed two investment advisers, Bill C. Crafton, Jr. ("Crafton"), the founder of Martin Kelly Capital Management, LLC ("Martin Kelly Capital"), and James S. Tagliaferri ("Tagliaferri"), the president and chief compliance officer of TAG Virgin Islands, Inc. ("TAG VI"), to purchase Gerova stock in their client accounts, to lessen the price-depressing impact of the substantial sales from FF-1's accounts on Gerova's share price. Defendant Hamels—Crafton's colleague, who handled the purchases of Gerova in Martin Kelly Capital client accounts—engaged in matched trading with Jared Galanis, agreeing ahead of time to the times, prices and amounts of Gerova stock to purchase in his clients' accounts. The purpose of this matched trading was to stabilize the price of Gerova's stock and provide the appearance of a legitimate market for the shares.

## VIOLATIONS

5.      By virtue of the conduct alleged herein, each of the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws as follows:

6.      Jason Galanis violated:

- Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]; and,

- Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

7.     Jared Galanis violated:

- Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], or, in the alternative, Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Hamels' violations of Sections 9(a)(1) and 10(b) of the Exchange Act [15 U.S.C. § 78i(a)(1), § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and,

- Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Jason Galanis's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

8.     Derek Galanis violated:

- Sections 5(a) and (c) of the Securities Act 15 U.S.C. §§ 77e(a) and (c)];

- Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)], or, in the alternative, Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] by aiding and abetting Jason Galanis's and FF-1's violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)];

4

- Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], or, in the alternative, Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Jason Galanis's and FF-1's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

9.     John Galanis violated Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Jason Galanis's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

10.     Hirst violated:

- Sections 5(a) and (c) of the Securities Act 15 U.S.C. §§ 77e(a) and (c)], and,

- Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Jason Galanis's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

11.     Hamels violated:

- Sections 9(a)(1) and 10(b) of the Exchange Act [15 U.S.C. § 78i(a)(1), § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

- Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], or, in the alternative, Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)] by aiding and abetting

Crafton's violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to the authority conferred on it by Sections 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Sections 21(d)(1), and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)] and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], seeking a final judgment: (a) restraining and permanently enjoining each of the Defendants from engaging in the acts, practices and courses of business alleged against them herein; (b) ordering each of the Defendants to disgorge all ill-gotten gains and to pay prejudgment interest on those amounts; (c) prohibiting Jason Galanis and Hirst from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (d) imposing civil money penalties on Jason Galanis, Jared Galanis, Derek Galanis and Hirst pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], on Jason Galanis, John Galanis, Jared Galanis, Derek Galanis, Hirst and Hamels pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and on Hamels pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

13.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Section 22(a) of the Securities Act [15. U.S.C. § 77v(a)], Sections 21(d) and 27 of the Exchange Act [15. U.S.C. §§ 78u(e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. The Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the transactions, acts, practices, or courses of business alleged herein, certain of which occurred in this District. For example, shares of

Gerova transferred to FF-1 were held at the Depository Trust Corporation, located in New York, New York. Additionally, Gerova's transfer agent (the "Transfer Agent") is located in New York, New York.

## DEFENDANTS

14.     **Jason W. Galanis**, age 45, resides in Los Angeles, California. In <u>SEC v. Penthouse Int'l, Inc., et al.</u>, 05 Civ. 0780 (RWS)(S.D.N.Y.) ("<u>Penthouse</u>"), the Commission charged him with accounting fraud and financial reporting violations. On April 27, 2007, pursuant to a settlement with the Commission, the <u>Penthouse</u> Court enjoined Jason Galanis from further violations of Exchange Act Section 10(b) (and Rule 10b-5 thereunder) and Section 15(d) and Rules 12b-20, 15d-11, and 15d-3 thereunder, barred him from serving as an officer and director of a public company for a period of five years, or through April 2012, and ordered him to pay a civil penalty of $60,000.

15.     **John P. Galanis**, age 72, resides in Oceanside, California. He is the father of Defendants Jason Galanis, Jared Galanis, and Derek Galanis, and has been the subject of numerous prior criminal proceedings, as well as enforcement actions by the Commission arising out of his violations of the federal securities laws. Significantly, on July 5, 1988, he was convicted in the United States District Court for the Southern District of New York on 44 counts of an indictment charging him with various felonies, including securities fraud, arising from a series of multimillion-dollar fraud and racketeering schemes perpetrated throughout the United States, and was sentenced to 27 years in prison. <u>United States v. John P. Galanis</u>, No 7:87 Cr. 520-CLB (S.D.N.Y.). In 1971, the Commission filed a civil injunctive action against John Galanis and others, alleging that between 1969 and 1971, he manipulated the prices of certain securities that were traded on the over-the-counter market. On June 21, 1972, John Galanis was

permanently enjoined in that proceeding from future violations of the antifraud provisions of the federal securities laws, and subsequently pled guilty to two felony indictments filed by the United States Attorney's Office for the Southern District of New York arising out of the same conduct, and was sentenced to a five year term of imprisonment.

16.     **Jared M. Galanis**, age 36, resides in Baltimore, Maryland.  He is an attorney who, during the relevant period, was the principal of a law firm called The Sentinel Law Group ("Sentinel Law"), based in San Francisco, CA.

17.     **Derek M. Galanis**, age 43, resides in Oceanside, CA.  In 2003, Derek Galanis pled guilty to one count of an indictment filed in United States v. Louis Alba, et al., No. 3:01-cr-3177 (S.D. Cal.), charging him with conspiracy to manufacture and distribute a controlled substance.  He was sentenced to 135 months imprisonment and a three year period of supervised release.  All of the acts Derek Galanis committed in furtherance of the scheme set forth herein were committed by him while he was under supervised release.

18.     **Gary T. Hirst**, age 63, resides in Lake Mary, Florida.  Hirst served as president of Gerova from October 2007 until February 2011, as a member of Gerova's board of directors (the "Board") from March 2007 until February 2011, and as chairman of Gerova's Board from April 2010 until February 2011.  Hirst and Jason Galanis first met in 2004 or 2005, and have worked together on multiple business ventures.

19.     **Gavin L. Hamels**, age 38, resides in Encinitas, California.  He is currently employed as a portfolio manager and investment adviser representative with Your Source Financial, PLC, a Commission-registered investment adviser.  From October 2007 to April 2010, he was employed by Martin Kelly Capital, a Commission-registered investment adviser, as a senior vice president and portfolio manager, and from approximately January 2010 until he was

terminated in September 2010, Hamels was employed as a "Client Advisor" in the Wealth &

Investment Management line of business of a large financial institution, referred to herein as

"Bank 1." Hamels was registered as a broker-dealer representative with Westmoore Securities,

Inc. from August 2007 until January 2009, and C.E. Unterberg, Towbin, LLC from October 2003

until February 2007.

<div align="center">

**FACTS**

</div>

**Jason Galanis's Development and Control of Gerova**

      20.    Jason Galanis was instrumental in the formation and development of Gerova. In

2005 and 2006, Jason Galanis advised members of a wealthy family based in Macau on potential

investments. In or about the third quarter of 2006, Jason Galanis introduced a member of the

family to a Gibraltar-based fund (the "Gibraltar Fund"), controlled by a Jason Galanis business

associate, to discuss the establishment of a Special Purpose Acquisition Corporation, or "SPAC,"

with a focus on acquisitions based in Asia.

      21.    A SPAC is a collective investment structure that allows public stock market

investors to invest in private equity-type transactions. SPACs are shell or blank-check

companies that have no operations but offer shares to the public with the intention of merging

with or acquiring a company with the proceeds of the SPAC's initial public offering ("IPO")

within a set time.

      22.    The Gibraltar Fund and the member of the Macau family agreed to create Asia

Special Situation Acquisition Corp. ("ASSAC"), which was formed as a SPAC in the Cayman

Islands on March 22, 2007, and which filed with the Commission a Form S-1 Registration

Statement to offer shares to the public on August 6, 2007. On January 23, 2008, ASSAC

<div align="center">

9

</div>

completed its IPO, raising $115 million from the public, and the company's ordinary shares, units and warrants began trading on the NYSE Amex.

23.     As consideration for bringing the parties together to create the SPAC, the Gibraltar Fund paid Jason Galanis $600,000. In addition, following the IPO, Jason Galanis and the Gibraltar Fund entered into a consulting agreement, which entitled Jason Galanis up to 30% of the profits the Gibraltar Fund derived from its ASSAC investment, in exchange for his work to identify potential acquisition targets for ASSAC.

24.     In January 2010, ASSAC faced a deadline under SPAC rules to acquire assets or return the money raised from its public shareholders. On January 19, 2010, ASSAC announced that its shareholders approved several acquisitions, including, among others, the assets and investments held by Wimbledon Financing Master Fund Ltd. and Wimbledon Real Estate Financing Fund Ltd. (the "Wimbledon Funds"), which were acquired from Weston Capital Management, Inc. ("Weston Capital"). ASSAC's shareholders also approved an amendment to the company's articles and memorandum of association to change ASSAC's name to "Gerova Financial Group, Ltd.," effective as of January 21, 2010.

25.     After January 21, 2010, Gerova's units, ordinary shares and warrants continued to trade on the NYSE Amex exchange until September 7, 2010, and began trading on the NYSE on September 8, 2010.

26.     Far beyond the terms of his consulting agreement with the Gibraltar Fund, Jason Galanis substantially influenced the management, operation, and business direction of Gerova from its inception. He regularly attended Gerova Board meetings and had pre-existing business relationships with members of the Board; he consulted management, company counsel and the Board on senior management hiring and firing decisions; he reviewed draft Commission filings

and consulted Gerova's officers, directors and company counsel concerning disclosures made therein; he interacted with Gerova's public relations firms concerning the content of Gerova's press releases; and gave orders to Gerova's counsel and management concerning actions to be taken with respect to its securities.

27.     Mindful of the officer and director bar imposed on him in the Penthouse matter that prohibited him from acting in either capacity at any public company until 2012, Jason Galanis made sure that his official capacity at the Company was limited, holding himself out only as an "investment banker" or advisor to the company. However, in October 2010, he became CEO of a Gerova subsidiary—Gerova Advisors LLC ("Gerova Advisors")—in order to formalize his relationship with the company. In that capacity, Jason Galanis was to receive success fees upon the consummation of material financings or acquisitions by Gerova that were introduced or consulted on by Gerova Advisors.

28.     Jason Galanis's deep involvement with Gerova went undisclosed to public shareholders. The only disclosures concerning Jason Galanis's association with Gerova were made in (1) the company's Form 20-F, dated June 2, 2010, which attached an exhibit revealing that Jason Galanis was appointed to serve on the Gerova Real Estate Committee, and (2) a Form 6-K, dated February 10, 2011, disclosing that Jason Galanis terminated his employment with Gerova Advisors in February 2011. No disclosure was made of his presence at Board meetings, or his close and pre-existing relationship to Hirst, other senior officers, company counsel, and many of Gerova's Board members.

29.     Also undisclosed was Jason Galanis's substantial holdings of Gerova stock through various shell companies. For example, Jason Galanis and Hirst were indirect controlling shareholders of Rineon Group, Inc. ("Rineon"), a Nevada corporation with common stock

quoted on OTC Link.  As of May 24, 2010, Rineon was Gerova's largest shareholder, holding 9,025,000 restricted Gerova shares, or 6.8% of the total number of shares outstanding.

**Jason Galanis Orchestrates a Scheme to Fraudulently Induce Gerova to Issue Gerova Shares to His Foreign Nominee and Liquidate the Shares in Unregistered and Unlawful Distributions for the Benefit of Jason Galanis, His Family, and His Associates**

30.    In the spring of 2010, Jason Galanis devised a way to use his influence at Gerova to fraudulently induce the Company to issue a sizeable block of unrestricted stock to a foreign nominee, FF-1, and to liquidate it in the public markets, evading the registration requirements of the federal securities laws.  Recognizing that a foreign national who represented that he would only sell shares abroad could qualify for an exemption from the registration requirements, and could therefore be issued shares without restrictive legends thereby allowing them to be immediately re-sold, Jason Galanis sought a candidate who could act as a front through which he could liquidate millions of shares of Gerova stock.  Jason Galanis enlisted his brothers, Jared and Derek, and his father, John, in his scheme.

31.    Derek Galanis, with knowledge of the scheme, recruited his friend, FF-1, to serve as the foreign nominee.  On May 22, 2010, Derek Galanis sent an e-mail to FF-1, with the subject "[i]t's a huge deal with huge cash flow," and wrote:  "All we need is a foreign national we trust which is where you come in my friend."  On May 23, 2010, Derek Galanis sent another e-mail to FF-1, requesting "brokerage information or banking information of relationships [FF-1 had] for personal or business accounts that would help," and adding "[t]his is it my friend.  A way for us to help each other and our families."  FF-1 knowingly agreed to act as the foreign national in Jason Galanis's scheme.

32.    Once FF-1 was on board, Jason Galanis, or others acting at his direction, drafted several agreements to support the fraudulent issuance of shares to FF-1 by Gerova.  The first was

a consulting agreement between Gerova and FF-1, dated as of January 22, 2010, which obligated FF-1 to provide periodic consulting services to Gerova (the "Consulting Agreement"). The Consulting Agreement further provided that fees due and paid under the agreement were in full settlement of prior consulting services provided by FF-1 to Gerova, namely, the introduction of Gerova to Weston Capital, from which Gerova had acquired the Wimbledon Funds. The Consulting Agreement called for FF-1 to receive a "Success Fee" following the acquisition of the Wimbledon Funds amounting to 2% of the $114 million total implied valuation of Weston Capital—approximately $2.28 million.

33.     The Consulting Agreement, however, was a sham. FF-1 never performed any consulting services for Gerova, and did not introduce Weston to Gerova. That introduction was made by another individual, a business associate of Jason Galanis who later became the CEO of the Company in late 2010. In fact, FF-1 never provided any services to Gerova, and had no connection to the Company whatsoever.

34.     In addition, although the Consulting Agreement was prepared in May 2010, it was backdated to January 22, 2010, to make it appear that FF-1 provided services related to Gerova's acquisition of the Wimbledon Funds.

35.     The second agreement that was used to support the fraudulent issuance of shares to FF-1 was a warrant agreement, prepared in May 2010 but backdated to March 29, 2010, and signed by Hirst in his capacity as president of Gerova (the "Warrant Agreement"). The Warrant Agreement stated that because the Success Fee due to FF-1 under his Consulting Agreement remained unpaid, it would be satisfied by issuing him 11,000,000 warrants. The Warrant Agreement added that the value of the warrants being delivered was equal to the Success Fee,

based on the average closing price of Gerova's public warrants for the 30 days prior to the date of the Warrant Agreement.

36.     The Warrant Agreement entitled FF-1 to purchase 11,000,000 ordinary shares of Gerova at $7.50/share. Thus, for example, if Gerova's stock was trading at any price above $7.50/share, FF-1 could exercise 11,000,000 warrants, paying $82,500,000 to Gerova in exchange for 11,000,000 ordinary shares. But the Warrant Agreement contained a cashless exercise provision that permitted FF-1 to exercise the warrants without paying any consideration. By invoking the cashless exercise provision, FF-1 would receive fewer shares than he would have been entitled to through a standard warrant exercise, calculated using a formula in the Warrant Agreement that factored in the average trading price of the shares on the three consecutive trading days prior to Gerova's receipt of the exercise notice, the strike price, and the number of warrants to be exercised.

37.     On May 21, 2010, FF-1 purportedly notified Gerova of his desire to exercise 10,000,000 of his 11,000,000 warrants, pursuant to the cashless exercise provision of the Warrant Agreement.

38.     On May 26, 2010, at Jason Galanis's request, and to ensure that the shares issued to FF-1 would be freely tradable, Hirst wrote a letter on behalf of Gerova to an attorney indicating that FF-1 had exercised 10,000,000 warrants under the cashless exercise provision, was to receive 5,333,333 Gerova shares in exchange, and was seeking an opinion that the shares could be issued without any restrictive legend. The attorney to whom Hirst made the request lived and practiced in Westchester County, New York, and was a longtime friend of John Galanis and counsel to members of the Galanis family ("Attorney 1"). As Hirst knew, Galanis arranged for Attorney 1 to represent FF-1 and to write an opinion letter to Gerova's Transfer

14

Agent, which would justify the Transfer Agent's delivery of share certificates to FF-1 without restrictive legends, making them eligible for sale immediately.

39.     That same day, at Jason Galanis's direction, FF-1 sent Attorney 1 his own letter to provide the representations Attorney 1 would need to draft his opinion letter to the Transfer Agent in support of a request for the issuance of unrestricted shares.  In his letter, FF-1 represented, among other things, that he (1) was a foreign resident and citizen, and (2) intended to sell his shares only outside the United States, in compliance with Reg. S of the Securities Act.

40.     Attorney 1 drafted and sent the Transfer Agent his opinion, opining that based on FF-1's representations that his sales would be offshore, the shares could be issued without restrictive legends because FF-1's sales would be exempt from registration pursuant to Rule 904 of Reg. S of the Securities Act.

41.     At the request of Jason Galanis, on May 26, 2010, Hirst signed and sent a letter on behalf of Gerova to the Transfer Agent, authorizing the transfer of 5,333,333 ordinary shares to FF-1, without restrictive legends.  The Transfer Agent did so on May 27, 2010.

42.     On May 27, 2010, FF-1 received 5,333,333 unrestricted shares of Gerova, which constituted roughly half of Gerova's public float.  No registration statement was in effect with respect to FF-1's shares.

43.     On the day FF-1 received the shares, Gerova's stock price closed at $13.56 per share, giving the shares a market value of over $72,000,000.

44.     Hirst knew that the issuance of shares to FF-1 was fraudulent:

    a)     Hirst knew that the Consulting Agreement had been backdated to January 22, 2010, and that FF-1 had done no consulting work for Gerova that entitled him to any Success Fee.  On April 23, 2010, well after the date on

the FF-1 Consulting Agreement, Hirst wrote a letter to the NYSE that purported to list all of Gerova's consulting agreements, but made no mention of any agreement with FF-1.

b)   Hirst approved the issuance of shares to FF-1, notwithstanding the fact that FF-1 failed to provide 61 days advance notice of his intent to exercise the warrants, as the Warrant Agreement required.  FF-1 purportedly provided notice of exercise on May 21, 2010, and received his shares only six days later.

c)   The value of the warrants issued to FF-1 greatly exceeded the $2.28 million Success Fee.  The Warrant Agreement calculated the value of the warrants based on the average closing price of the publicly traded warrants in the 30 days leading up to March 29, 2010—the date the agreement was executed.  The average closing price of the public warrants over those 30 days was $0.2990.  Based on that average closing price, FF-1 should have only received approximately 7.6 million warrants, not 11 million.

d)   The number of shares that FF-1 received by invoking the cashless exercise provision of the Warrant Agreement was also inconsistent with the terms of the Warrant Agreement.  Based on the share conversion formula set out in the Warrant Agreement, and Gerova's stock price, FF-1—who executed only 10,000,000 of his 11,000,000 warrants—should have received 5,023,255 shares at a $7.50 strike price, or 5,355,010 shares at a $7.00 strike price, not 5,333,333 shares.

16

e)      As Hirst knew, the number of shares that FF-1 received exactly matched the number of restricted shares that were returned by the former CEO of Gerova, who was fired on April 7, 2010.  As part of his termination, the former CEO entered into a Share Repurchase Agreement with Gerova, dated April 8, 2010, pursuant to which he was obligated to return 5,333,333 shares that had been sold to his limited liability company when he began working for Gerova.  Hirst did nothing to cancel those shares until June 1, 2010, when he instructed Gerova's Transfer Agent to cancel the 5,333,333 shares issued to former CEO, retroactive to May 27, 2010— the same day that FF-1 received his 5,333,333 shares.  Given that the number of shares FF-1 could receive under the cashless exercise provision would vary widely depending on Gerova's stock price, it was nearly impossible that FF-1 would receive the exact number of shares that the former CEO had just returned to the company.

f)      The value of the shares issued to FF-1 greatly exceeded the $2.28 million Success Fee.  On May 27, 2010, the date that FF-1 received the ordinary shares, Gerova's stock price closed at $13.56/share, making the 5,333,333 shares worth over $72 million.

45.    Hirst's knowledge of the fraudulent nature of the share issuance to FF-1 is also evident from the steps he took to conceal the transaction:

a)      Hirst never told the chief financial officer of Gerova ("CFO") about the existence of the Consulting Agreement.  The CFO learned about the Consulting Agreement from a separate individual in late May or early

June 2010, while in the process of preparing Gerova's Form 20-F annual

disclosures and compiling the expenses associated with Gerova's January

acquisitions, including the Wimbledon Funds.  When the CFO asked Hirst

about the Consulting Agreement in late May or early June 2010, Hirst

assured him that it was a valid agreement, and that FF-1 provided the

services to Gerova, which Hirst knew was not true.

b)      Hirst knew that issuing shares to FF-1 required Board approval, but never

sought it at any time before he signed the Warrant Agreement or the letters

to the Transfer Agent and Attorney 1 in late May 2010.  Gerova's

memorandum and articles of association required that all new issuances of

securities, even those already authorized, be approved by the full Board,

but Hirst did not raise the matter at any of the Board meetings that took

place in the spring or summer of 2010.

c)      Hirst never alerted Gerova's CFO to the issuance of FF-1's warrants and

shares.  Rather, the CFO learned that fact in September 2010, when he was

trying to understand a discrepancy between Gerova's internal shareholder

lists and the Transfer Agent's shareholder lists, and asked Hirst about it.

Indeed, at the time that the CFO sought an explanation of the Consulting

Agreement from Hirst in late May or early June 2010, the warrants and

shares had already been issued to FF-1, but Hirst failed to mention that

fact.

46.      When the Board was finally asked to ratify the issuance of shares to FF-1 at a

meeting held October 6, 2010, Hirst presented the issuance to the Board without disclosing

several material facts, including that the shares received by FF-1 gave him control over nearly one half of the entire issued and unrestricted shares of Gerova, and that FF-1 had already sold 1.6 million shares, garnering almost $12.4 million in proceeds.

**Jason Galanis, John Galanis, Derek Galanis, and Jared Galanis Work to Open Brokerage Accounts for FF-1 and Begin Selling the Stock; Gerova's Stock Price Falls**

47.     Through Jason Galanis's and Derek Galanis's contacts, and in knowing furtherance of the scheme, Jason Galanis, Jared Galanis, John Galanis and Derek Galanis arranged for the deposit of the shares issued to FF-1 into U.S. brokerage accounts at three brokerage firms, referred to herein as "Brokerage Firm 1," "Brokerage Firm 2," and "Brokerage Firm 3" (collectively, the "FF-1 Accounts"), and began directing the liquidation of the FF-1 shares.

48.     FF-1, Jared Galanis and John Galanis all gave orders to sell stock from the FF-1 Accounts, either directly to the brokers at the firms, or to the authorized traders on the accounts, which included Jared Galanis and Derek Galanis.  For example, on November 15, 2010, John Galanis gave instructions to a business associate who had trading authority on FF-1's brokerage account to "sell 40,000 shares of [Gerova] from [FF-1's] account at [Brokerage Firm 3].  Most important you put orders 10,000 shares at a time every hour on the hour starting at 10:00 PST with the last one 10 minuets [sp.] before the close."

49.     All told, the FF-1 accounts sold a net of:

- Approximately $10,000,000 worth of Gerova stock from Brokerage Firm 1 between June 14, 2010 and February 2, 2011;

- Approximately $1,800,000 from Brokerage Firm 2 between July 22, 2010 and July 27, 2010; and

- Approximately $8,200,000 from Brokerage Firm 3 between October 12, 2010 and May 26, 2011.

The sum total of sales of Gerova stock from the FF-1 Accounts was approximately $20 million. Contrary to FF-1's representation that he would sell his shares outside the United States, all of the shares were sold in United States' markets.

50.     John Galanis, Jared Galanis, and Derek Galanis served as liaisons between the brokerage firms and FF-1, obtaining the necessary paperwork from FF-1 to open the accounts and to designate themselves and others as authorized traders, and instructing FF-1 on what information to provide the brokerage firms to respond to inquiries, sell shares, and transfer funds.

51.     For example, FF-1 initially opened a brokerage account and deposited the Gerova shares at a brokerage firm to which he had been referred by Jason Galanis (the "Initial Brokerage Firm"). The Initial Brokerage Firm questioned FF-1 about how he had obtained the 5,333,333 shares, and John Galanis counseled FF-1 on how to respond to those questions. Specifically, on June 8, 2010, John Galanis sent FF-1 an e-mail with the subject "information on the acquisition you brought," and a description of Weston Capital—the entity that FF-1 supposedly introduced to Gerova and for which he purportedly received his multi-million dollar Success Fee.

52.     A few days later, the Initial Brokerage Firm asked FF-1 to close his account when it could not obtain satisfactory information about the origin of FF-1's shares. On June 14, 2010, Jason Galanis e-mailed the Initial Brokerage Firm that at their request, FF-1 agreed to move his account, and added that the transfer from FF-1's account to an account at Brokerage Firm 1 needed to be done "this AM on the [Initial Brokerage Firm's] side."

53.     FF-1's Brokerage Firm 1 account received 5,333,333 Gerova shares from the Initial Brokerage Firm on June 14, 2010, and stock was sold from that account that same day.

The FF-1 Account realized a net profit of $6,435,537.02 from trading during the month of June 2010.  More than half of the sale orders in FF-1's brokerage account at the firm came from Jared Galanis, to whom FF-1 gave full trading authority.  Derek Galanis also had limited trading authority on FF-1's brokerage account at Brokerage Firm 1.

54.     Between June 14, 2010 and June 29, 2010, Gerova's stock price declined 67%, from $17.25 per share to $5.63 per share at the June 29th close.  The decline coincided with $6,801,955 in sales of Gerova stock from the FF-1's Brokerage Firm 1 account during the same period.  Sales of Gerova stock from FF-1's account at Brokerage Firm 1 constituted 22% of the total Gerova stock sales between June 14th and June 29th.

55.     The decline in Gerova's stock price concerned Jason Galanis, as evidenced by several e-mails he exchanged with business associates whom he tried to persuade to buy the stock to support its price.  For example, on June 30, 2010, Jason Galanis e-mailed two business associates, stating "Stock is stabilized in here.  Need to talk taking it back up," to which one of the associates responded "On it."  Jason Galanis replied that "[i]t will move with a little support. We would all benefit from it in the $9-10 range."

56.     To stabilize Gerova's stock price—and support the value of the unsold Gerova shares the FF-1 Accounts—in mid-2010, Jason Galanis began to look for buyers of Gerova stock, particularly those who could be relied on to hold it rather than sell it, in order to stabilize the price.

**Jason Galanis Bribes Crafton to Purchase $5,000,000 of Gerova Stock in Client Accounts**

57.     Martin Kelly Capital was a registered investment adviser firm founded by Crafton in approximately June 2006, with a client roster of mostly U.S.-based professional athletes.  By the end of 2009, Martin Kelly Capital had 50 clients, with over $110 million in assets under

management.  Defendant Hamels—Crafton's lifelong friend—was Martin Kelly Capital's senior vice president and portfolio manager.

58.     In late November 2009, Bank 1, a large financial institution, acquired Crafton's relationships from Martin Kelly Capital, and hired Crafton, Hamels, and other Martin Kelly employees.  Crafton served as co-manager of Bank 1's sports practice within its Sports & Entertainment Specialty Group and as co-manager of the San Diego, CA office of the Sports & Entertainment Specialty Group.  Throughout the relevant period, between June 2010 and September 2010, both Hamels and Crafton provided investment advice to clients and were compensated, or were eligible to be compensated, for that advice.

59.     By June 2010, Crafton's and Hamels' clients at Bank 1 had invested over $26 million in certain funds run by Matthew Jennings ("Jennings") that collectively operated under the brand name "Westmoore": Westmoore Management, LLC, Westmoore Investment, L.P., Westmoore Capital Management, Inc., and Westmoore Capital, LLC.  On June 16, 2010, the Commission sued Jennings and obtained an emergency court order freezing the assets of Jennings and four Westmoore entities based on allegations that Jennings had orchestrated a $53 million Ponzi-like investment scheme.  SEC v. Jennings, et. al., Civ. No. SACV-10-00849-AG (MLGX) (C.D. Cal.).

60.     With the Westmoore entities' assets frozen, Crafton and Hamels sought options to restore liquidity to their clients who were invested in Westmoore, with the ultimate goal of protecting their client relationships.  Crafton and Hamels sought help from Jennings, who proposed that they meet Jason Galanis to discuss possible solutions.

61.     On or around June 23, 2010, Hamels, Crafton, Jason Galanis and Jennings met in Los Angeles, California, to discuss options for protecting the value of their clients' investments

22

in Westmoore.  Jason Galanis proposed transferring shares of two publicly-traded entities—

Rineon and WLMG Holding Inc. ("WLMG Holding")—to Crafton's and Hamels' clients to

compensate them for their Westmoore losses.  Jason Galanis also offered to provide up to $2

million cash for affected clients who had immediate liquidity needs.  In exchange, Jason Galanis

asked that Crafton and Hamels invest $10 million of their clients' funds in Gerova, through

market orders.  Hamels and Crafton agreed to the proposal, but determined that $5 million to $6

million was the most their clients could invest.

62.      Neither Hamels nor Crafton told anyone at Bank 1, or their clients, about their

agreement with Jason Galanis.

63.      Hamels, Jason Galanis, and Jared Galanis followed through on the terms of the

agreement.  Jason Galanis, with knowing assistance from Jared Galanis, bribed Crafton to make

open market purchases of Gerova stock by transferring money and Rineon and WLMG Holding

shares to Crafton's clients at Bank 1.  In exchange, Hamels placed periodic purchase orders for

Gerova stock on behalf of his and Crafton's clients, often at the direction of Jared Galanis, to

coincide with sales from the FF-1 accounts.

64.      On June 30, 2010, Jason Galanis e-mailed Jared Galanis that he reached a deal

with Hamels, and directed him to wire money to Crafton's and Hamels' clients who needed

liquidity.  That same day, Jared Galanis, with knowledge of the terms of Jason Galanis's

agreement with Crafton and Hamels, wired $185,000 from the Sentinel Law trust account to two

Bank 1 clients of Crafton and Hamels who suffered substantial losses from their Westmoore

investments.  Through the summer, Jared Galanis made three other transfers of cash through

wires to Bank 1 clients who needed immediate liquidity: a $100,000 payment on June 28, 2010;

a $4,560 payment on August 6, 2010, and a $15,000 payment on September 10, 2010.

65.    In knowing furtherance of Jason Galanis's agreement with Crafton and Hamels, Jared Galanis also directed transfer agents to transfer Rineon and WLMG Holding stock to Crafton's and Hamel's clients at Bank 1.  In late July and August 2010, those clients received approximately 600,000 shares of Rineon, and 970,000 shares of WLMG Holding stock, all of which were transferred at the direction of Jason Galanis.  Pricing the WLMG Holding stock at $12/share, and the Rineon stock at $24/share, Crafton and Hamels estimated that their clients received $11.6 million worth of WLMG Holding stock, and $14.4 million worth of Rineon stock.

66.    For his part, and also pursuant to his agreement with Jason Galanis, Hamels purchased approximately 903,086 shares of Gerova stock, through the market, in 60 of his clients' accounts between July 6, 2010 and September 10, 2010, at a total cost of $5,305,901. Neither Crafton nor Hamels disclosed to their clients that the purchases were made pursuant to the agreement they reached with Jason Galanis for the benefit of clients who suffered a loss (or at least a loss of liquidity) as a result of their Westmoore investments.  When one client asked about the Gerova stock in his account, Hamels told him that he was "spreading some around to clients who would have an appetite for individual stocks," without revealing the true motive. That information was material and would have been important for the Gerova-buying Bank 1 clients to know.

67.    Between July 22, 2010 and September 10, 2010, many of Hamels' purchases of Gerova stock in client accounts were coordinated by Jared Galanis, at the direction of Jason Galanis, to ensure that Hamels purchased Gerova stock at roughly the same times that sales from the FF-1 Accounts were being executed.  Hamels and Jared Galanis spoke by telephone to coordinate the purchase times, amounts, and quantities.  On nearly 50 occasions, sell orders from the FF-1 Accounts (placed by Jared Galanis, or FF-1, on Jared Galanis's instruction), and

Hamels' buy orders, were placed within 10 minutes of each other, often only seconds apart. Many times, the sell orders placed in the FF-1 Accounts, and buy orders placed by Hamels, were made at exactly the same times, prices, and amounts. Hamels understood that he was asked to purchase Gerova stock because Jason Galanis and Jared Galanis wanted to create the appearance of liquidity in the market for Gerova.

68.      Jared Galanis coordinated both sides of the matched trades. In one instance, on July 22, 2010, Jared Galanis e-mailed FF-1, directing him to give his broker at Brokerage Firm 2 instructions to "[s]ell 310,000 shares of [Gerova] at $5.60 or better." FF-1 complied. That same day, Jared Galanis had 9 separate phone calls with Hamels, culminating with Hamels purchasing 259,979 shares of Gerova in client accounts—at a total cost of $1,471,481.14. Hamels' purchases occurred at approximately the same times as sales from the FF-1 Account at Brokerage Firm 2, which realized $1,747,700.00 from the sales.

69.      Between July 6, 2010 and September 10, 2010—the period when Hamels purchased Gerova stock in Bank 1 client accounts—Gerova's stock price stabilized between $5.00 and $7.00 per share.

70.      Hamels and Crafton were terminated by Bank 1 in September 2010 after the firm discovered the agreement they made with Jason Galanis. Bank 1 reimbursed the clients for whom Hamels purchased Gerova shares, and attempted to liquidate the Gerova holdings in their accounts. Jason Galanis attempted to recover the Gerova stock from Bank 1 to prevent it from selling the shares on the open market and depressing the stock price. He also attempted, repeatedly, to recover the Rineon and WLMG Holding shares that he transferred to the Bank 1 clients. John Galanis joined in the effort to recover the Rineon and WLMG Holding stock, making veiled threats in a telephone call to Crafton's and Hamels' lawyer in the fall of 2010.

**Jason Galanis Bribes Tagliaferri to Buy Gerova Stock in TAG VI Client Accounts**

71.     Having lost their matched trading partner in Hamels, Jason Galanis and Jared

Galanis turned to Tagliaferri.  Tagliaferri was the president, chief compliance officer, and one of

two owners of TAG VI, a corporation with its principal place of business in St. Thomas, U.S.

Virgin Islands and a Commission-registered investment adviser until June 30, 2011.

72.     Tagliaferri and Jason Galanis had a long-standing mutually beneficial

relationship.  From approximately 2007 until 2010, and prior to his role in the Gerova matched

trading described below, Tagliaferri accepted bribes from Jason Galanis and his related entities

in exchange for investing his clients in notes issued by Jason Galanis-related entities.  For

example, Tagliaferri caused at least eighteen clients to invest a total of at least $3.4 million in

notes issued by 1920 Bel Air LLC, a holding company that owned Jason Galanis's primary

residence at 1920 Bel Air Drive in Beverly Hills, California.

73.     In July 2014, Tagliaferri was convicted of committing investment adviser fraud

and securities fraud, among other felonies, arising in part from his investment of client assets in

Jason Galanis-related notes.  United States v. James Tagliaferri, 13-cr-15 (S.D.N.Y.).  Tagliaferri

is currently serving his sentence of 72 months in a federal penitentiary.

74.     In September 2010, Jason Galanis also recruited Tagliaferri to help out in his

scheme to stabilize the price of Gerova stock so that he and his brothers and father could

continue selling shares from the FF-1 Accounts and generate substantial proceeds from the sales.

Between September 2010 and February 2011, as a result of bribes Jason Galanis made,

Tagliaferri purchased approximately 1.6 million shares of Gerova stock for client accounts,

through market orders, at a total cost of approximately $24.5 million.  On 40 dates during that

time period, Tagliaferri's purchases coincided with sales of Gerova from the FF-1 Accounts effected by Jared Galanis or FF-1.

75.     Correspondence between Jared Galanis and Tagliaferri demonstrate that the trades were not coincidental, but coordinated. For example, on October 19, 2010, Jared Galanis, acting in knowing furtherance of the scheme, asked Tagliaferri to do "5k in here," and told Tagliaferri that he needed the bid "above $5, very important." That day, Tagliaferri purchased 24,000 shares of Gerova at $5.01/share, and either Jared Galanis or FF-1 sold 2,016 shares of Gerova at $5.10/share from the FF-1 Accounts.

76.     In a December 13, 2010 e-mail, Jared Galanis asked Tagliaferri to put in a "bid pre-opening for 3500 shares at 26," and on the following day, Tagliaferri confirmed that he put in a "pre-market order to buy 3000 @ $26." Also on December 13, 2010, Jared Galanis forwarded Tagliaferri a message that Jason Galanis sent to Hirst, in which Jason Galanis reported that "[Tagliaferri] has acquired 975,000 POST SPLIT [Gerova] shares in the market thus far," adding that Tagliaferri "is the sole reason this [stock] isn't in the toilet."

77.     Jason Galanis, with knowing assistance from John Galanis, bribed Tagliaferri to invest his clients in Gerova. On October 28, 2010, Asia Capital Markets Limited, LLC ("Asia Capital Markets")—a Nevada-based LLC controlled by John Galanis—sent instructions to Gerova's Transfer Agent to transfer 1,636,100 shares to an account in the name of Basileus Holdings, LLC ("Basileus Holdings") at TAG VI. Basileus Holdings was controlled by Jason Galanis. On October 29, 2010, Jason Galanis's mother, acting at his request, sent a letter to the custodian for the TAG VI accounts, instructing it to accept 1,636,100 Gerova shares into the Basileus Holdings account. From the Basileus Holdings account at TAG VI, Jared Galanis and Chandra Galanis instructed TAG VI to distribute Gerova shares to clients of TAG VI in whose

accounts Tagliaferri had purchased Gerova shares.  When clients asked Tagliaferri why they were receiving the Asia Capital Markets shares, Tagliaferri told them that it was a 2-for-1, "buy one get one free," or a special dividend from Gerova, to thank them for their purchase of Gerova shares.

78.     In addition, in January and February 2011, $125,000 was transferred from Asia Capital Markets to an account at TAG VI controlled by Tagliaferri and his business partner. Tagliaferri told none of his clients about his agreement with Jason Galanis to purchase Gerova shares in return for Jason Galanis's gift to them of Gerova shares, his receipt of $125,000 from Jason Galanis, or of his arrangement with Jared Galanis to coordinate his buys with the sales from the FF-1 Accounts, or his agreement to put in bids at prices that Jared Galanis dictated.

**Proceeds of the FF-1 Accounts' Gerova Stock Sales Are Transferred to Jason Galanis and His Affiliates**

79.     Between June 14, 2010 and June 10, 2011, sales of Gerova stock in the FF-1 Accounts netted approximately $20 million.

80.     John Galanis, with knowledge of the scheme, assisted FF-1 in opening bank accounts through a contact at another large financial institution referred to herein as "Bank 2." Proceeds of the Gerova stock sales were transferred to FF-1's bank accounts at Bank 2, which were managed by Jared Galanis, Derek Galanis, and an associate of John Galanis who acted on his behalf and at his direction.

81.     Some transfers of the Gerova stock sale proceeds were made directly from the FF-1 Accounts to FF-1's personal bank accounts, or bank accounts in the names of corporate entities under his control, and were then distributed to Jason Galanis and his associates.  In other instances, the proceeds of the sales and loans were first wired from the FF-1 Accounts to Attorney-1's or Jared Galanis's attorney trust accounts, and were then distributed to Jason

Galanis and his associates. Jason Galanis, John Galanis, Jared Galanis, and Derek Galanis all gave instructions on where and when to wire the funds.

82.    FF-1 received at least $310,000 of the Gerova stock sale proceeds. Jason Galanis, John Galanis, Jared Galanis, Derek Galanis and FF-1 transferred approximately $16.9 million of the FF-1 Accounts' Gerova stock sale proceeds to Jason Galanis; his or Hirst's corporate entities; Galanis family members; Galanis family trust funds; various law firms and accounting firms that provided services to Jason Galanis and his affiliated entities; Jason Galanis's business associates; and investors in notes and CDs on which Jason Galanis owed repayments. For example:

a)    $2,620,000 was transferred to a corporation controlled by Hirst;

b)    Approximately $1,300,000 was transferred to Jason Galanis and corporate entities that he owned, controlled, or was associated with, including, among others: $498,033 to Stanwich Absolute Return, Ltd.; $400,000 to Prospect Global Resources, Inc.; $373,650 to 1920 Bel Air LLC; $130,500 to Emerging Markets Global Hedge Ltd.; and, $116,000 to Jason Galanis's personal bank accounts;

c)    $100,000 was transferred to John Galanis, and $331,000 was transferred to Little Giggles LLC, a limited liability company that John Galanis controlled;

d)    $194,500 was transferred to Sentinel Law's checking account, which was controlled by Jared Galanis, and $13,000 was wired to Jared Galanis's personal account;

e)    $32,500 was transferred to an entity controlled by Derek Galanis, and $53,800 was transferred to Derek Galanis's personal account.

29

83.     Other members of the Galanis family received at least $770,000 of the FF-1

Accounts' Gerova sale proceeds, including the following amounts:

    a)      $575,800 to the Galanis Family Trust, for which John Galanis served as
            trustee, and which listed the Galanis brothers as beneficiaries.  John
            Galanis frequently used funds in the Galanis Family Trust's account to
            pay personal expenses;

    b)      $39,000 to the wife of John Galanis, the mother of Jason, Derek and Jared
            Galanis;

    c)      $16,000 to Jason Galanis's wife; and,

    d)      $13,000 to a fourth Galanis brother, not named in this complaint, and
            $5,000 to his company.

84.     At least $3,400,000 of the proceeds was wired to law firms and attorneys

representing Jason Galanis or the entities he controlled, including:

    a)      $2,052,000 to "Law Firm 1," which has provided legal counsel to Jason
            Galanis;

    b)      $607,250 to Attorney 1, the Galanis family lawyer who represented FF-1
            in obtaining the Gerova shares without restrictive legends, and also acted
            as conduit in wiring the proceeds of the FF-1 Accounts' stock sales;

    c)      $505,000 to "Law Firm 2," which then transferred funds to shareholders
            of WLMG Holding as compensation for the sale of their stock to Crafton's
            and Hamels' Bank 1 clients; and

    d)      $245,000 to "Law Firm 3," in connection with a settlement of a legal
            dispute involving Jason Galanis.

85.     Approximately $4.4 million was used to repay Jason Galanis-affiliated notes and
CDs issued to Tagliaferri's clients, and on which Jason Galanis or his entities owed repayments.

**Trading of Gerova's Stock on the NYSE Is Suspended and Gerova's Stock Price
Collapses; Gerova Enters Liquidation**

86.     In early January 2011, two articles were published about Gerova—one by Forbes,
and one by Dalrymple Finance LLP.  Both concluded that Gerova featured many hallmarks of a
classic fraud, including a lack of financial disclosure, impaired or overvalued assets, undisclosed
related-party transactions, and strong ties to individuals and entities who have been sanctioned,
sued or shut down by regulators, including Jason Galanis.  In mid-February 2011, four board
members of Gerova resigned, including Hirst.  Jason Galanis also terminated his employment
with Gerova Advisors.  On February 23, 2011, the NYSE halted trading of Gerova's securities.

87.     Between the release of the Forbes and Dalrymple articles in early January 2011
and the halt of trading on February 23, 2011, Gerova's stock price declined from a high of
$28.75 per share on January 6, 2011, to $5.28 per share on February 23, 2011.  On April 21,
2011, Gerova asked the NYSE to delist its securities, and on May 9, 2011, Gerova filed a Form
25 with the Commission, deregistering its securities.  The stock price closed at $1.02 per share
on May 20, 2011, and continued falling, bottoming at $0.00 per share on November 2, 2011.

88.     Gerova commenced liquidation proceedings in Bermuda on July 20, 2012, and
filed a Chapter 15 petition for bankruptcy protection in the United States Bankruptcy Court for
the Southern District of New York on August 24, 2012.  In re Gerova Financial Group, Ltd., No.
12-bk-13641 (Bankr. S.D.N.Y.).

**FIRST CLAIM FOR RELIEF**
**Violations of Sections 5(a) and (c) of the Securities Act**
**(Against Jason Galanis, Jared Galanis, Derek Galanis, and Hirst)**

89.     Paragraphs 1 through 88 are re-alleged and incorporated by reference as if set forth fully herein.

90.     Jason Galanis, Jared Galanis, Derek Galanis, and Hirst each, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities and when no exemption from registration was applicable.

91.     By virtue of the foregoing, Jason Galanis, Jared Galanis, Derek Galanis, and Hirst each violated and, unless restrained and enjoined, will continue violating, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

**SECOND CLAIM FOR RELIEF**
**Violations and Aiding and Abetting Violations of Section 17(a)(1) of the Securities Act**
**(Against Jason Galanis, Jared Galanis, and Derek Galanis)**

92.     Paragraphs 1 through 88 are re-alleged and incorporated by reference as if set forth fully herein.

93.     Jason Galanis, Jared Galanis, and Derek Galanis each, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails in the offer or sale of securities, with scienter, employed devices, schemes or artifices to defraud.

94.     By virtue of the foregoing, Jason Galanis, Jared Galanis and Derek Galanis each, directly or indirectly, violated, and unless restrained and enjoined, will continue violating, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

95.     In the alternative, Derek Galanis, directly or indirectly, provided knowing and substantial assistance to Jason Galanis and FF-1, who, directly or indirectly, singly or in concert with others, in the offer or sale of a security, with scienter, used the means or instruments of transportation or communication in interstate commerce or used the mails to employ devices, schemes or artifices to defraud.

96.     By virtue of the foregoing, Derek Galanis aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, violations of Section 17(a)(1) of the Securities Act [15 U.S.C. §77q(a)(1)] in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

<div align="center">

**THIRD CLAIM FOR RELIEF**
**Violations of and Aiding and Abetting Violations of Section**
**10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder**
**(Against Jason Galanis, Jared Galanis, Derek Galanis and Hamels)**

</div>

97.     Paragraphs 1 through 88 are re-alleged and incorporated by reference as if set forth fully herein.

98.     Jason Galanis, Jared Galanis, Derek Galanis, and Hamels each, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud; and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

99.     By virtue of the foregoing, Jason Galanis, Jared Galanis, Derek Galanis, and Hamels each violated, and unless restrained and enjoined, will continue violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)].

100.     In the alternative, Jared Galanis directly or indirectly, provided knowing and substantial assistance to Jason Galanis and Hamels, who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud; and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

101.     By virtue of the foregoing, Jared Galanis aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

102.     In the alternative, Derek Galanis directly or indirectly, provided knowing and substantial assistance to Jason Galanis and FF-1, who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud; and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

103.     By virtue of the foregoing, Derek Galanis aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act

34

[15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

**FOURTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of**
**Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder**
**(Against John Galanis and Hirst)**

104.     Paragraphs 1 through 88 are re-alleged and incorporated by reference as if set forth full herein.

105.     John Galanis and Hirst, directly or indirectly, provided knowing and substantial assistance to Jason Galanis, who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud; and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

106.     By virtue of the foregoing, John Galanis and Hirst aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

**FIFTH CLAIM FOR RELIEF**
**Violations of Section 9(a)(1) of the Exchange Act**
**(Against Hamels)**

107.     Paragraphs 1 through 88 are re-alleged and incorporated by reference as if set forth fully herein.

108.     Hamels, directly or indirectly, singly or in concert with others, by use of the mails or the means or instrumentalities of interstate commerce, or of a facility of a national securities exchange, with scienter, and for the purpose of creating a false or misleading appearance of

active trading in Gerova securities, or a false or misleading appearance with respect to the market for Gerova securities, engaged in the following unlawful activity:

Entered an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time and substantially the same price, for the sale of such security, had been or would be entered by or for the same or different parties.

109.    By virtue of the foregoing, Hamels violated, and unless restrained and enjoined, will continue violating Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)].

<div align="center">

**SIXTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 9(a)(1) of the Exchange Act**
**(Against Jared Galanis)**

</div>

110.    Paragraphs 1 through 88 are re-alleged and incorporated by reference as if set forth fully herein.

111.    Jared Galanis, directly or indirectly, provided knowing and substantial assistance to Hamels, who, directly or indirectly, singly or in concert with others, by use of the mails or the means or instrumentalities of interstate commerce, or of a facility of a national securities exchange, with scienter, and for the purpose of creating a false or misleading appearance of active trading in Gerova securities, or a false or misleading appearance with respect to the market for Gerova securities, engaged in the following unlawful activity: Entered an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time and substantially the same price, for the sale of such security, had been or would be entered by or for the same or different parties.

112.    By virtue of the foregoing, Jared Galanis aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, violations of Section 9(a)(1) of the Exchange

<div align="center">36</div>

Act [15 U.S.C. § 78i(a)(1)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

### SEVENTH CLAIM FOR RELIEF
### Violations of and Aiding and Abetting Violations of
### Sections 206(1) and 206(2) of the Exchange Act
### (Against Hamels)

113.    Paragraphs 1 through 88 are re-alleged and incorporated by reference as if set forth fully herein.

114.    Hamels, while acting as an investment adviser, by use of the mails, or the means and instrumentalities of interstate commerce, directly or indirectly, singly or in concert with others: (a) employed devices, schemes, or artifices to defraud his clients or prospective clients with scienter; and (b) knowingly, recklessly or negligently engaged in transactions, practices, and courses of business which operated or would have operated as a fraud or deceit upon clients or prospective clients.

115.    By virtue of the foregoing, Hamels violated, and unless restrained and enjoined, will continue violating, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

116.    In the alternative, Hamels, directly or indirectly, provided knowing and substantial assistance to Crafton, who, while acting as an investment adviser, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, singly or in concert with others: (a) employed devices, schemes, or artifices to defraud his clients or prospective clients with scienter; and (b) knowingly, recklessly or negligently engaged in transactions, practices, and courses of business which operated or would have operated as a fraud or deceit upon clients or prospective clients.

117.    By virtue of the foregoing, Hamels aided and abetted, and unless restrained and enjoined, will continue aiding and abetting, violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and 80b-6(2)] in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Jason Galanis, Jared Galanis, Derek Galanis, and Hirst, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

### II.

Permanently restraining and enjoining Jason Galanis, Jared Galanis, and Derek Galanis, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)];

### III.

Permanently restraining and enjoining Defendants Jason Galanis, John Galanis, Jared Galanis, Derek Galanis, Hirst, and Hamels, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the

injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

### IV.

Permanently restraining and enjoining Hamels and Jared Galanis, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)];

### V.

Permanently restraining and enjoining Hamels, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

### VI.

Permanently barring Jason Galanis and Hirst from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

### VII.

Directing each of the Defendants to disgorge all ill-gotten gains, plus prejudgment interest thereon;

### VIII.

Directing Jason Galanis, Jared Galanis, Derek Galanis, and Hirst to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

**IX.**

Directing Jason Galanis, John Galanis, Jared Galanis, Derek Galanis, Hirst and Hamels to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**X.**

Directing Hamels to pay civil money penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

**XI.**

Granting such other and further relief as this Court deems just and appropriate.

Dated: September 24, 2015
New York, New York

SECURITIES AND EXCHANGE COMMISSION

By: ______________________
Andrew M. Calamari
Regional Director

New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022

Phone: (212) 336-1023 (Brown)
Email: brownn@sec.gov

Attorney for Plaintiff

Of Counsel:
Sheldon L. Pollock
Nancy A. Brown
H. Gregory Baker